**E.I. DU PONT de NEMOURS & COMPANY (CHESTNUT RUN), Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 82–3363.**

United States Court of Appeals, Third Circuit.

Argued March 16, 1983.

Decided Dec. 29, 1983.*

---

\* This opinion was vacated and superceded by E. I. DuPont de Nemours & Co. v. N.L.R.B., 3d Cir., 733 F.2d 296.

Peter D. Walther (argued), Robert H. Young, Jr., James A. Matthews, III, Drinker Biddle & Reath, Philadelphia, Pa., for petitioner; John F. Lawless, E.I. Du Pont de Nemours & Company, Legal Department, Wilmington, Del., of counsel.

Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Christine Weiner (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., for respondent.

Carl L. Taylor, Tom Kirby, Kirkland & Ellis, Washington, D.C., for the Chamber of Commerce of the United States, as amicus curiae; Stephen A. Bokat, National Chamber Litigation Center, Washington, D.C., of counsel.

Before ADAMS and GARTH, Circuit Judges and ACKERMAN, District Judge *.

## OPINION OF THE COURT

HAROLD A. ACKERMAN, District Judge:

### I.

In *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975), the

---

* Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

Supreme Court upheld a ruling by the National Labor Relations Board (the Board) that Section 7 of the National Labor Relations Act (the Act), 29 U.S.C. § 157, protected a unionized employee's right to refuse to submit to an investigatory interview without the presence of a union representative, where the employee reasonably believed that the interview might result in discipline. The central issue before us is whether the Board erred in construing *Weingarten* to apply to a non-unionized workplace. Because we find the Board's construction to be permissible, we enforce the Board's order.

At approximately 7:45 a.m. on the morning of November 15, 1978, Walter Slaughter, a laboratory technician employed by petitioner E.I. Du Pont de Nemours & Company (Du Pont), posted a "Notice to Employees"[1] on the canteen bulletin board before beginning work. His supervisor, Thomas Farley, was in the canteen at the time. Farley informed Slaughter that he had violated company policy by posting a notice without permission and told Slaughter to take it down. Slaughter, having previously used the bulletin board without incident, protested that Farley was interfering with his lawful right to organize and refused to comply. Farley pointed his finger at Slaughter, saying that he wanted to discuss the incident later.[2]

Shortly thereafter, Farley telephoned Slaughter at his work station and stated that he wished to discuss the canteen incident with Slaughter at his office. Slaughter replied that he would discuss the matter with Farley only if a fellow employee acted as a witness during the interview. Farley terminated this conversation with the comment, "I'll talk to you later."

About an hour later, Farley approached Slaughter on the mill floor. Once again he attempted to initiate a discussion of the canteen incident with Slaughter. Slaughter again responded that he was willing to do so as long as Farley would allow him to "have a third party present." Following some additional discussion, Farley ended the conversation by stating, "I'll see you later."

Shortly after the mill floor conversation, Farley returned and told Slaughter to gather his personal belongings and report to the foreman's desk. This order was immediately obeyed. Subsequently, Slaughter was instructed to report to the front office, and then to the office of Maynard Ritter, the shift supervisor. These orders were likewise followed without protest. While there, Farley again tried to engage Slaughter in a discussion of the canteen posting. Slaughter's response was that he would be "more than happy" to discuss the matter, as long as he had a fellow employee present as a witness. Following this comment, Slaughter brought co-worker Jimmy Fields[3] into the office, offering him as a potential and willing witness. Farley refused to enter into a discussion with the co-worker present, and instead ordered Fields to return to his job assignment.

Farley then asked Slaughter whether either Maynard Ritter or Dick Robinson, an industrial relations supervisor, would be acceptable as a witness. Slaughter declined this offer, stating that both men were representatives of management. According to the Board, Slaughter thereupon sought the assistance of Sheila Wilson, a fellow employee in the accounting department, located across the hall from where they had been meeting. Slaughter stated to her that "It appears I'm going to be disciplined in some way" and asked her whether she would "be a third party" for him. The Board found that Farley then gave Slaughter an ultima-

---

1. The "Notice," a printed poster that explains the basic rights of employees under the Act, was sent to Slaughter by the Regional Office of the Board in response to his request for information on union organizing.

2. Farley had placed Slaughter on probation the previous month. At that time he had been warned that he would have to "follow [the] rules to the hilt" in the future, and that his work would be reviewed monthly.

3. Fields was known by both Slaughter and Farley to be a local official of the NAACP.

tum, stating that this was his "last opportunity to discuss the incident of this morning." Farley added that Slaughter's job was now "in jeopardy."

After some further discussion, Slaughter was told that he was being dismissed until further notice, but that this action did not constitute a final discharge. With that, he was sent home.

Representatives of Du Pont continued to press Slaughter for a meeting following his suspension. Slaughter eventually did meet alone with Robinson on November 24, 1978. Thereafter, on November 29, 1978, Slaughter was recalled to the plant and discharged by Farley.

In sum, the Board found that during the six hours that followed the canteen posting incident, Farley had requested on at least four occasions that Slaughter enter into a discussion with him regarding the posting of the notice. *E.I. du Pont de Nemours,* 262 N.L.R.B. 1028, 1028–29 (1982). On each of these occasions, Slaughter had indicated that he would discuss the matter, but only if a fellow employee was present. The Board noted that throughout that day Slaughter otherwise obeyed without protest or delay all orders from his supervisors. *Id.*

Based on this evidence, the Board, affirming the Administrative Law Judge (ALJ) with modification,[4] found that Slaughter had a right, under Section 7 of the Act, 29 U.S.C. § 157, to insist upon the presence of an employee witness at his interview with Farley. The Board concluded that, by discharging Slaughter for asserting that right, petitioner Du Pont had violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1). The Board ordered Du Pont to cease compelling employees to participate in investigatory interviews without representation by fellow employees when the employees reasonably believe the interview may result in disciplinary action. The

Board also ordered reinstatement and backpay for Slaughter.

Before this Court, Du Pont argues that the Board erred in applying the *Weingarten* rule to a non-union workplace and that the Board's factual findings are not supported by substantial evidence. We decline to accept either contention.

## II.

### A.

■ In deciding whether the Board's construction of the Act in this case is permissible, we are required by the Supreme Court to accord special deference to the expertise of the Board. We may not deny enforcement merely because we would prefer another result, or even because we believe that the Act could be read to support a conclusion contrary to that adopted by the Board. Rather, we are instructed to enforce orders. of the Board so long as " '[t]he Board's construction ..., while it may not be required by the Act, is at least permissible under it ....' " *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 2475, 76 L.Ed.2d 667 (1983), quoting *NLRB v. Weingarten,* 420 U.S. at 266–67, 95 S.Ct. at 968. *See NLRB v. Erie Resistor Corp.,* 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963); *Giacalone v. NLRB,* 682 F.2d 427, 430 (3d Cir.1982).

■ Review of the Board's factual determinations is, of course, governed by the substantial evidence test; such findings are to be affirmed "if supported by substantial evidence on the record as a whole ...." 29 U.S.C. § 160(e).

### B.

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), makes it unlawful for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights

---

**4.** The Board "affirm[ed] the rulings, findings, and conclusions of the Administrative Law Judge, as modified" by the Board's own opinion in this case. 262 N.L.R.B. at 1028. The Board's modifications of the ALJ's statement of facts were limited to minor amendments to the

chronology of events and a re-examination of the record in light of the Board's intervening decision in *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980). Throughout this opinion we refer to the Board's opinion unless otherwise indicated.

guaranteed in Section 7." Section 7, in turn, provides, in pertinent part, that:

> Employees shall have the right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .

The Board first construed Section 7 to create a right in an employee of a unionized employer to refuse to submit to an investigatory interview without the presence of a union representative, where the employee reasonably believes the interview might result in disciplinary action, in *Quality Manufacturing Co.*, 195 N.L.R.B. 197 (1972), *enforcement denied*, 481 F.2d 1018 (4th Cir. 1973), *rev'd and enf'd sub nom. ILGWU v. Quality Manufacturing Co.*, 420 U.S. 276, 95 S.Ct. 972, 43 L.Ed.2d 189 (1975); and *Mobil Oil Co.*, 196 N.L.R.B. 1052 (1972), *enforcement denied*, 482 F.2d 842 (7th Cir.1973). The Supreme Court first upheld the Board's construction of Section 7 in this context in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975).

In finding the Board's construction to be not inconsistent with the Act, the Court in *Weingarten* identified five justifications for the Board's decision. First, the Court noted that although the employee alone has an immediate stake in the outcome of the investigatory interview, nevertheless the union representative whose participation is sought would help safeguard the interests of the entire bargaining unit by exercising vigilance over the fairness and uniformity of the employer's disciplinary practices. *Id.* at 260–61, 95 S.Ct. at 965–66. Second, the Court suggested that the representative's presence provides an assurance to other workers that they, too, can obtain such aid and protection if and when they need it. *Id.* at 261, 95 S.Ct. at 965. Third, the Court stated that the presence of a representative

serves the most fundamental purposes of the Act in helping to eliminate and redress the perceived imbalance of economic as well as of bargaining power between labor and management. *Id.* at 261–62, 95 S.Ct. at 965–66, *citing American Ship Building Co. v. NLRB*, 380 U.S. 300, 316, 85 S.Ct. 955, 966, 13 L.Ed.2d 855 (1965). Fourth, the presence of a representative could, the Court found, assist a "fearful and inarticulate" employee to relate accurately the incident being investigated. This may prove particularly beneficial to the employer, since by helping the parties to get to the bottom of the incident more efficiently, valuable production time may be saved. 420 U.S. at 262–63, 95 S.Ct. at 966. Finally, the Court recognized that the representative may be able, through informal discussion and persuasion conducted at the threshold, to serve as the catalyst in the amicable resolution of disputes, and, in the union context, be able to discourage unjustified grievances. 420 U.S. at 262–63, 262 n. 7, 95 S.Ct. at 966 n. 7.

Nowhere in the *Weingarten* opinion is its holding expressly grounded on the existence of a union. Nor can it be suggested that the *Weingarten* Court was unaware of the possible application of its holding to a non-union context, for Justice Powell noted this potential extension of the majority's analysis in his dissent. 420 U.S. at 270 n. 1, 95 S.Ct. at 969 n. 1. Had the *Weingarten* majority wished to limit its holding to the union setting, it could have done so explicitly.

We conclude that the logic and reasoning of *Weingarten* carry equal force in the non-union context.[5] First, it appears to us that an employee's request that a coworker be his or her representative in an

---

**5.** Judge Adams notes that he has reservations about the wisdom of applying *Weingarten* principles to a non-union setting in the same way they have been applied in a union setting. In particular, Judge Adams believes that the Board's decision in this case may generate unforeseen difficulties because a non-unionized coworker representative lacks the objectivity and expertise of a union steward and because such non-union representatives do not operate under the constraints imposed by an established labor organization. *See Materials Research Corp.*, 262 NLRB 1010 (1982) at 1019 (Van De Water, Chmn., dissenting in relevant part) and 1021–22 (Hunter, Member, dissenting in relevant part). Nevertheless, in light of the Supreme Court's opinion in *Weingarten*, Judge Adams is unprepared to hold, despite his concerns, that the Board's decision here is inconsistent with the Act.

investigatory interview builds solidarity and vigilance among employees in the absence of a union no differently than it does where a collective bargaining representative has been recognized. Both the initial request by the employee and the willingness by the co-worker to respond by lending his assistance assures the co-worker, " 'in case his turn ever comes, of the support of the one [he is] then helping.' " *Id.* at 261, 95 S.Ct. at 965, quoting *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.,* 130 F.2d 503, 505 (2d Cir.1941). Such voluntary action by one worker on behalf of another may stimulate others to follow the example, thereby establishing a matrix of mutual support and assistance.

The extension of *Weingarten* to the nonunion context also serves in the same manner to help eliminate the inequality of bargaining power between employees and employers. Indeed the perception by workers of an imbalance of power may be heightened in the absence of a union, and the risks of improper or even unintentional intimidation of employees by management may be accentuated. Similarly, the co-worker's presence may facilitate a more expeditious, efficient and equitable disposition of disputes, and perhaps even serve to help settle them informally. It is thus apparent that each of the Court's justifications for the result reached in *Weingarten* is also present in the non-union context as well.

C.

The only other Court of Appeals that has had to consider this issue denied enforcement of the Board's order. *E.I. du Pont de Nemours & Co. v. NLRB,* 707 F.2d 1076 (9th Cir.1983). In that case, the employee, Henry Burke, had been "docked" a portion of his paycheck for an unauthorized visit to a doctor. Burke refused to sign his time card for that pay period and was suspended. *Id.* at 1077. On the following day, he was called into work by his supervisor. Following his arrival, his supervisor read him an "interview record" of performance deficiencies and asked him to sign an acknowledgment that he had been read its contents.

Burke refused to do so. *Id.* Burke's "second level" supervisor was then called in. He produced a "Development Program" for Burke which listed conditions for his continued employment at Du Pont. *Id.* Burke asked for copies of both the interview record and the Development Program. When these requests were denied, Burke said he would not sign either document unless a co-worker was present as a witness. This request was also denied, and Burke was terminated. *Id.*

Based on these facts, the Ninth Circuit held that the General Counsel had failed to establish that Burke's request for a witness constituted "concerted activity" within the meaning of the Act. *Id.* at 1080. The court discerned "no evidence of any past activity involving Burke and other employees, and . . . no indication that any other employee would respond to Burke's request." *Id.* at 1079. Further, Burke "was at all times willing to waive his request for a witness if Du Pont would give him these documents." *Id.* The court distinguished *Weingarten* by suggesting that concertedness had there been assumed "from the request for a *union* representative." *Id.* at 1078 (emphasis added). While acknowledging that Weingarten's holding is not necessarily limited to unionized employees, the Ninth Circuit panel stated that in the non-union context the Board must make an explicit showing that "the requesting employee acts as part of a group." *Id.* at 1079.

We believe the Ninth Circuit's interpretation of *Weingarten* to be foreclosed by the Supreme Court's expansive interpretation of Section 7 in the *Weingarten* opinion itself. In particular, the Court's citation, apparently with approval, of *Mobil Oil Corp. v. NLRB,* 482 F.2d 842, 847 (7th Cir.1973), cited at 420 U.S. at 260, 95 S.Ct. at 965, suggests that the proper focus in evaluating the requirement of concertedness in this context should be on the literal nature of the activity that would take place if the employee's request was granted. Until Congress or the Supreme Court commands

a narrower view of the Act, we must defer to the Board's construction.[6]

### III.

■ Substantial evidence supports the Board's determination that Du Pont violated the Section 7 rights of Slaughter. First, the record amply demonstrates that Slaughter reasonably believed the interview might result in discipline—a prerequisite to finding Section 7 activity in this case. The evidence relied on by the Board is uncontradicted: Slaughter had previously been placed on probation by Farley for an unexcused absence; he had been told by Farley to "follow the rules to the hilt;" he had also been told by Farley that the unauthorized posting of the notice in the canteen was a violation of company policy; and he believed Farley intended to question him about this unauthorized posting. In these circumstances, and applying an "objective standard," *see Weingarten,* 420 U.S. at 257 n. 5, 95 S.Ct. at 964 n. 5, we conclude that substantial evidence supports the Board's finding of a reasonable belief.

Second, the Board's finding that Slaughter would not have been discharged absent his protected activity is also supported by substantial evidence. Specifically, the Board first considered Du Pont's claim that Slaughter would have been legitimately discharged in any event because of his unauthorized posting of a notice while on probation. As the Board correctly noted, Du Pont conceded this point before the ALJ, stating that Farley did not intend to discipline Slaughter for the posting infraction. 262 N.L.R.B. at 1029; *see* Transcript of Hearing before ALJ, July 7, 1980, App. at 97A. The Board also rejected Du Pont's suggestion that Slaughter would have been validly discharged for insubordination,

apart from and independent of his protected activity:

> The evidence shows . . . that Slaughter repeatedly stated his willingness to go to an interview if Respondent would grant his request for a witness. Furthermore, the facts show that Slaughter at no time was disorderly or presented any threat of violence in the work area; was not disrespectful to any superior; and complied immediately when told to report to the front desk, the front office, and Ritter's office. The record is also clear that Slaughter proposed and brought to Farley two alternative witnesses, both unsatisfactory to Farley.

> \*     \*     \*     \*     \*     \*

> It is evident that any "insubordination" on the part of Slaughter was restricted to his insisting on having an employee of his choice present at any discussion concerning the posting incident. In so insisting, he was asserting his *Weingarten* right, and he could not be disciplined under the guise of "insubordination," as he was here, for exercising that right.

262 N.L.R.B. at 1029.

These findings by the Board are amply supported by evidence on the record as a whole.

We cannot agree with our dissenting colleague that this matter needs to be remanded to the Board "for findings based on a uniform test of causation," Dissenting Op. at 1076, that is, the test for mixed-motive discharge cases announced by the Board in *Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced on other grounds,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 77 L.Ed.2d 667 (1983).[7] Although we share Judge Garth's

---

**6.** Additionally, we note that the facts underlying the Ninth Circuit's opinion are readily distinguishable from those of the situation before us. Indeed, *Weingarten* may not have been applicable there even if the employees had been unionized, given that Burke's encounters with his supervisors could hardly be characterized as investigatory interviews.

**7.** The *Wright Line* decision clarified the Board's approach to discharges motivated by both legitimate and illegitimate reasons. *Wright Line* articulated a substantive standard and a burden-of-proof rule for deciding these "mixed-motive" discharge cases. Borrowing from the Supreme Court's analysis in *Mt. Healthy City School Dist. Bd. of Ed. v. Doyle,* 429 U.S. 274,

concern that important legal issues not be resolved on the basis of an inadequate factual record, we are persuaded that in the present proceeding, the recent developments in the law of mixed-motive discharges did not affect the decisions of either the ALJ or the Board.

■ As this case was analyzed by the ALJ, the *Wright Line* test was irrelevant, and therefore it did not matter that his decision preceded *Wright Line*. The ALJ stated in the opening sentence of his "Discussion" that "Respondent's sole reason for its discharge of Slaughter was his insubordination in refusing to submit to an interview without an employee witness." 262 N.L.R.B. at 1030 (emphasis added). The ALJ further noted that Du Pont had even "concede[d] that Slaughter was discharged for insubordinately refusing to submit to the meeting without a 'witness' . . ." *Id.* at 1031. This finding was reiterated by the ALJ in his "Conclusions of Law," in which he stated that Du Pont had discharged Slaughter "because he refused to be interviewed without the attendance of an em-

ployee witness." *Id.* at 1032. Given his determination that Slaughter's discharge was motivated solely by Du Pont's improper animus, the ALJ had no reason to apply any rule for evaluating evidence in mixed-motive discharge cases. In the absence of a second motive, application of the *Wright Line* rule would be a waste of judicial resources.

Moreover, any analytic deficiency in the ALJ's decision was cured on appeal to the Board. Rather than simply adopt the findings of the ALJ, the Board performed an independent analysis of the record and explicitly applied the *Wright Line* rule. 262 N.L.R.B. at 1029. Correctly explaining that *Wright Line* requires an employer to "demonstrate that the same action would have taken place even in the absence of the protected activity," *id.,* the Board found that Du Pont failed to meet its burden of persuasion. Given that the Board, and not the ALJ, is ultimately responsible for factfinding,[8] and given our determination that the Board's finding is amply supported by the record, *see supra* at 1068,[9] we are

97 S.Ct. 568, 50 L.Ed.2d 471 (1974), the Board decided that a mixed motive discharge is not violative of the Act when an employee would have been discharged even if he had not engaged in any protected activity. The Board held that once the General Counsel has established by a preponderance of the evidence that a discharge is in any way motivated by animus against a protected right, the burden of persuasion shifts to the employer to show by a preponderance of the evidence that the employee would have been discharged on the basis of valid reasons alone.

Before the Supreme Court's decision in *Transportation Management,* the Third Circuit refused to accept the NLRB's *Wright Line* rule. *See Behring International, Inc. v. NLRB,* 675 F.2d 83 (3d Cir.1982), *vacated and remanded,* —— U.S. ——, 103 S.Ct. 3104, 77 L.Ed.2d 1359 (1983). Under the old Third Circuit approach, the burden-of-persuasion never shifted to the employer. Rather, the NLRB General Counsel was required to demonstrate not only that an employer was in part motivated by improper animus, but also that in the absence of the protected activity, the employer would not have discharged the employee.

8. See 29 U.S.C. §§ 160(e) and (f) (1976) ("the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be con-

clusive"); 29 U.S.C. § 160(c) (1976) ("the Board shall state its findings of fact"); *see also Stein Seal Co. v. NLRB,* 605 F.2d 703, 706 (3d Cir.1979) ("the ALJ's findings and recommendations, when contested, become merely advisory and the Board itself makes an original disposition of the case"); *NLRB v. Duquesne Electric and Mfg. Co.,* 518 F.2d 701, 704 (3d Cir.1975); *C–B Buick, Inc. v. NLRB,* 506 F.2d 1086, 1091 (3d Cir.1974).

9. Although the dissent professes to follow the rule that in NLRB proceedings, a court of appeals may not examine the record independently to determine the facts, it does just that. Most disturbing, however, are the dissent's repeated statements to the effect that the ALJ "totally" discredited Slaughter's testimony or "refus[ed] to credit" that testimony. This characterization is simply not supported by the ALJ's opinion. To be sure, the ALJ "principally derived" his fact statement from Farley, whom he labelled "more reliable" because of Slaughter's tendency to be "expansive" and "to answer his own questions and present arguments." 262 N.L.R.B. at 1030 n. 1. This observation, however, by no means constitutes a wholesale rejection of Slaughter's credibility. Indeed, in his only direct resolution of a credibility conflict, the ALJ chose Slaughter's version of the facts over Farley's. *Id.* at n. 2.

convinced that remanding this matter for additional proceedings under *Wright Line* would serve no useful purpose.[10]

## IV.

Accordingly, we will deny the petition for review and grant the Board's cross-petition for enforcement of its order.

GARTH, Circuit Judge, dissenting:

In this case, the Board seeks to have us enforce its order, which among other provisions, compels reinstatement of a discharged Du Pont employee. The Board, in concluding that employee Slaughter was dismissed because of his insistence that a co-worker witness be present at any interview which might lead to disciplinary action, based its order upon the principles of the Supreme Court decision in *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). The issue thus presented to us—an issue never before addressed by this Court—is whether such a

request by a *non-union* employee is protected activity under section 7 of the National Labor Relations Act. It is the extension of the *Weingarten* doctrine to the non-union context that makes the present issue one of first impression in this Circuit,[1] and one about which even a member of the majority has expressed substantial reservations. (See Majority Opinion, at 1065 n. 5, indicating Judge ADAMS' doubts in this respect.) In my opinion, the state of the record before us makes it impossible for this Court to reach, or even address, the *Weingarten* issue. This being so, it is manifest to me that we cannot grant enforcement of the Board's order. The threshold question which cannot be answered at this time, primarily because of the different burden of proof tests employed by the ALJ and the Board, is whether the cause-in-fact for Slaughter's dismissal was indeed his request for such a witness. A negative response to this inquiry would not implicate *Weingarten* principles, and thus would obviate any

10. Despite the fact that the Board decided this case while our Court was resisting application of *Wright Line,* the Board nevertheless chose to invoke the *Wright Line* rule. Thus we cannot accept the dissent's contention that the Board might make different findings on remand, now that the old Third Circuit rule has been rejected by the Supreme Court.

Of course, insofar as the Board conformed its analysis to the old rule of the Third Circuit and kept the burden of proof on the General Counsel, this reliance on the prior approach would make no difference to the outcome of this case. If the General Counsel could establish a violation under the more stringent burden-of-proof rule which this Court adhered to before *Transportation Management,* then surely the General Counsel would prevail when aided by the shift in burden that *Transportation Management* has now approved.

1. *NLRB v. Weingarten* arose in a union context. There, the Supreme Court held that a request for a union representative to be present at any interview which might lead to disciplinary action was concerted activity for mutual aid and protection, and therefore fell within the protection of § 7 of the National Labor Relations Act. *See generally* Gregory, *The Employee's Right to Representation During Employer Investigatory Interviews: A Critical Analysis of the Evolution of Weingarten Principles,* 28 Vill.L.Rev. 572 (1983).

One other Court of Appeals has addressed this issue recently. The Ninth Circuit, in adjudicating a similar controversy between the same parties, declined to extend *Weingarten* to a non-union setting. *E.I. Du Pont de Nemours & Co. v. NLRB,* 707 F.2d 1076 (9th Cir.1983). It did so on the grounds that no concerted activity was involved with respect to the employer-employee interview in that case and that concerted activity was an essential component of § 7 of the Act. Because I have no occasion on this record to address the merits of the Board's claim, and thus the availability of *Weingarten* in a non-union context, I do no more than acknowledge the Ninth Circuit's decision, but I express no view with respect to its holding or analysis.

However, the majority opinion, which insists upon reaching this issue—a result which I believe to be unwise and indeed erroneous—has now created still another conflict between the circuits. The Chief Justice of the United States and the Congress have both expressed concern about such intercircuit conflicts. *See, e.g.,* H.R.1970, 98th Cong., 1st Sess., 129 Cong.Rec. H940 (March 3, 1983); S.R. 645, 98th Cong., 1st Sess., 129 Cong.Rec. S1845 (March 1, 1983) (proposing the establishment of an Intercircuit Tribunal of the Courts of Appeals to resolve intercircuit conflicts). This Court itself has reacted to this problem by adopting a procedure whereby such intercircuit conflicts are expressly brought to the attention of the full court on circulation of panel opinions.

need to decide whether *Weingarten* applies to non-union employees.[2] Because the record in its present posture cannot support enforcement of any order—*Weingarten* or otherwise—I believe that a remand to the Board and then to the ALJ is required.

### I.

Walter Slaughter, a Du Pont employee, had received a poster from the National Labor Relations Board concerning representation elections. He placed this poster on the bulletin board in the employee's cafeteria. Supervisor Thomas Farley observed Slaughter's activities. He asked Slaughter to come to his office to answer questions about the poster. Farley testified that after Slaughter posted the flyer received from the Board, Farley asked Slaughter to come to his office for a meeting to answer questions. Slaughter said that he would not discuss union activity without the presence of a third party. App. at 14–15, 175. Farley testified: "Walter, I did not even state the meeting, what the meeting was about. I just would like you to come to my office. He [Slaughter] refused." App. at 175. Farley testified that Slaughter refused several times to accompany him to his office, giving as his reason the failure to provide a witness of his choosing. The ALJ also found that when Slaughter and Farley met later in a hallway, Slaughter announced "somewhat loudly that he would not discuss union business without a third party. Farley replied that he had not said anything, but Slaughter once more made his intentions known, and a little louder." App. at 15. After being given several opportunities to come to Farley's office to discuss the incident in the cafeteria, Slaughter was suspended for insubordination, and was ultimately dismissed.

These alleged independent acts of insubordination in refusing to leave the worksite could clearly provide legitimate grounds for dismissal under *Roadway Express, Inc.,* 246 N.L.R.B. 1127 (1979). *See supra* note 2. The ALJ's opinion, however, found in one conclusory sentence that: "Respondent's sole reason for its discharge of Slaughter was his insubordination in refusing to submit to an interview without an employee witness." App. at 16. This finding, strangely enough, was made after the ALJ had discounted Slaughter's testimony[3] and had credited the testimony of Supervisor Farley, who testified for Du Pont. The ALJ stated that "Slaughter was, at best, expansive in his testimony and was inclined to answer his own questions and present arguments, rather than answer the precise questions asked of him." App. at 14 n. 1. Thus, all the findings made by the ALJ were based on the testimony of Supervisor Farley, whom the ALJ found to be more reliable than Slaughter.

The Board adopted the "finding" made by the ALJ, and, without any additional evidentiary explanation, agreed that

---

2. I observe that, even if *Weingarten* did apply, under *Roadway Express Inc.,* 246 N.L.R.B. 1127 (1979), an employee may be properly dismissed if, in addition to requesting a co-worker witness, he also commits other, independent acts of insubordination. In *Roadway Express,* the Board said:

> Simply stated, we find that an employee's *Weingarten* rights, with all its attendant safeguards, matures at the commencement of the interview, whether it be on the production floor or in a supervisor's office. If the employer chooses to initiate its investigation in a work area, then it is bound to comply immediately with an employee's request for representation there. *If, however, the employer, as here, asks the employee to leave the production area and go to an office or some other location where further discussion*

> *is contemplated, then the employee acts at his own peril if he or she declines to do so.* 246 N.L.R.B. at 1128 (emphasis added).

3. Slaughter was the only witness to testify in support of his charge. His testimony was credited only once in a matter unrelated to the issues in this case. App. at 15 n. 2.

Contrary to the majority's reading of the ALJ's opinion (*see* maj. op., at 1068 n. 9), the ALJ found Slaughter to be not credible, expansive in his testimony, and given to answer his own questions rather than the ones asked of him. App. at 14 n. 1. The disturbing aspect to which the majority opinion refers is not, therefore, my characterization of Slaughter's testimony, but is rather the fact that the Board accepted Slaughter's testimony after it had been discounted and not relied upon by the ALJ.

Slaughter was to be reinstated because the company had transgressed the rule of *Weingarten*. The Board then sought enforcement of its order in this Court. Curiously, the majority's opinion (at pp. 1068–1069) tracks the Board's opinion in totally ignoring the fact that Slaughter's testimony was, insofar as it involved the issues in this case, totally discredited by the ALJ. *See Eastern Engineering & Elevator Corp. v. NLRB*, 637 F.2d 191 (3d Cir.1980) & *infra* note 7.

At least two extremely troublesome and related problems are presented by the current state of the record. First, recognizing that the ALJ "found" that "Respondent's sole reason for its discharge of Slaughter was his insubordination in refusing to submit to an interview without an employee witness,"[4] App. at 16, no evidence has been identified on which such a finding could be predicated. *See, e.g., NLRB v. Armcor Industries*, 535 F.2d 239, 245 (3d Cir.1976) (appellate court requires articulation of reasons from Board). Second, even if such a "finding" were substantially supported in the record and had been adequately explained by the ALJ and the Board, it could not constitute the basis for sustaining the Board's order, since such a finding would have had to have been made pursuant to a now rejected test of causality or burden of proof. *See Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1084 (1980). Thus, the quantum of proof and the burden of persuasion necessary to prove Du Pont's motivation in dismissing Slaughter, an essential ingredient of the *Weingarten* rule if it is to be extended to a non-union context, cannot be determined on this record. In essence, therefore, whatever the quality of evidence, or the quality of findings that were made, because of the failure of the ALJ and the Board to utilize the correct and the *same* standard for determining a "mixed motive" discharge, the Board's order cannot be enforced.

## II.

At the outset, I stress that in examining the record and the testimony, I make no credibility judgments. I recognize that as a court we must accept factual findings made by administrative bodies such as the Board if they are supported by substantial evidence.[5] *E.g., Hedstrom v. NLRB*, 629 F.2d 305 (3d Cir.1980). For us to perform even this circumscribed function of judicial review, however, we require some explanation from the Board, predicated on the administrative record, of the basis on which such findings and conclusions rest. *Cf. Cotter v. Harris*, 642 F.2d 700, 704–05 (3d Cir.1981) (findings by Secretary regarding eligibility for Social Security benefits must contain indication of evidence accepted and rejected); *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir.1979) (Secretary must sufficiently explain weight given to evidence in order for court to scrutinize record to determine whether conclusions are rational). *See NLRB v. Permanent Label Corp.*, 657 F.2d 512, 532 (3d Cir.1982) (Garth, J. dissenting). As this Court has noted: "The 'reasoned basis for the agency's action' must be provided by the agency in the administrative proceedings. We 'may not accept appellate counsel's *post hoc* rationalizations for agency action.'" *Port Norris Express Co. v. ICC*, 687 F.2d 803 (3d Cir.1982) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

In this case, other than the one conclusory statement made by the ALJ that "Respondent's sole reason for its discharge of Slaughter was his insubordination in refusing to submit to an interview without an employee witness," nothing appears in the ALJ's opinion or the Board's adoption of his findings and conclusions to inform us as to the evidence upon which either of them

---

4. This sentence was contained not in the Findings of Fact but in the Discussion section of the ALJ's decision. The Board accepted this statement by the ALJ without any further comment on the evidence. App. at 6–7.

5. "Substantial evidence" has been defined as such relevant evidence as a reasoning mind might accept as adequate to support a conclusion. *Lewis v. Califano*, 616 F.2d 73, 76 (3d Cir.1980).

relied.[6] This is particularly puzzling considering that Du Pont's evidence and arguments went to great lengths in order to show that the acts committed by Slaughter were outside the protection of *Weingarten*.[7] It is not our role to examine the record independently to determine for ourselves the facts and conclusions which should be drawn from the evidence. However, while it may be the function of a court of appeals to review and instruct those agencies over which it has appellate jurisdiction, it is also necessary for the agency whose actions are being reviewed to inform the reviewing court of the basis of its decision. Without that information, it is impossible for us to perform our appellate function properly. As the Supreme Court stated in *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947):

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

*Id.* at 196–97, 67 S.Ct. at 1577 (quoting *United States v. Chicago, M., St. P. & P. R.R. Co.*, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935). *See also NLRB v. Permanent Label Corp.*, 657 F.2d 512, 532 (3d Cir.1982) (in banc) (Garth, J., dissenting).

If we are to function effectively as a court, then we must know the basis for the Board's findings and conclusions without regard to the context in which they arise. In my view, we are well within the bounds of our authority to require such explanations and articulations. The *Chenery* requirement, which focuses on effective judicial review, cannot be deemed to constitute an undue burden on the Board. Nor does it intrude in any respect upon internal Board procedures, so as to trench upon any of the principles expressed in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (review of *rule making* action rather than adjudicatory procedures); *see also Permanent Label*, 657 F.2d at 532. The requirement that the Board disclose the basis of its order when it exercises the discretion given to it by Congress is mandated in order that a court may perform its reviewing function properly and thereby guarantee the integrity of the administrative process.

Without any indication from the Board or from the ALJ as to how each justified the fact found or the conclusion reached, it is in

---

**6.** The majority opinion properly does not style this conclusory statement as a finding of fact, as it could not. Majority op., at 1069.

**7.** The Board, in rejecting Du Pont's allegation that Slaughter committed acts for which he could be dismissed under *Roadway Express, Inc.*, 246 N.L.R.B. 1127 (1979), stated that "Slaughter repeatedly stated his willingness to go to an interview if Respondent would grant his request for a witness." App. at 11. In thus crediting Slaughter's testimony, however, the Board relied on a witness *specifically discredited* by the ALJ. It did so without explanation and with no apparent reason, contrary to the requirements of *Standard Dry Wall Products, Inc.*, 91 N.L.R.B. 544, 545 (1950), *enforced,* 188 F.2d 362 (3d Cir.1951). I have already discussed in text *supra* the fact that the ALJ credited Farley's testimony and did not credit Slaughter's.

This Court, in *Eastern Engineering & Elevator Corp. v. NLRB,* 637 F.2d 191 (3d Cir.1980),

considered the problem of disparate findings between the Board and the ALJ concerning credibility of witnesses. We noted that the report of the ALJ constitutes a vital part of the record which the court must review in determining whether a finding is supported by substantial evidence. In such a case, "we must recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner, who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Id.* at 197 (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951)). *See also Edgewood Nursing Center, Inc. v. NLRB,* 581 F.2d 363 (3d Cir. 1978) (credibility determinations rest with ALJ as long as he considers all relevant factors and sufficiently explains his resolutions).

my judgment impossible for us to determine whether substantial evidence supports the Board's decision. This alone would require us to deny enforcement of the Board's order.

Of even greater concern, however, is the effect of the recent decision of the United States Supreme Court as it pertains to the present record. At the time that the ALJ's decision was rendered, August 22, 1980, the Board's "mixed motive" burden of proof doctrine set out in *Wright Line, A Division of Wright Line, Inc.,* 251 N.L.R.B. 1083 (1980), *enforced on other grounds,* 662 F.2d 899 (1st Cir.1981) (enforcing order but rejecting Board's allocation of burdens of proof), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), had yet to be announced. Apparently, the Board at that time would order reinstatement whenever it concluded that an employee's discharge was colored by no more than the "in part" causation test. The Board itself described that rule which it declined to enforce thereafter, as follows:

> In its present form the "in part" test provides that if a discharge is motivated, "in part," by the protected activities of the employee the discharge violates the Act even if a legitimate business reason was also relied on. . . .
>
> Since its inception, the "in part" test has been perceived by some to be, at least conceptually, at odds with the oft-repeated idea that:
>
>> Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids. [*N.L.R.B. v. MaGahey,* 233 F.2d 406, 413 (5th Cir. 1956)]. See also *Klate Holt Co.,* 161 NLRB 1606, 1612 (1966). Compare *Shattuck Den Mining Corporation v. N.L.R.B.,* 362 F.2d 466 (9th Cir.1966).

A conflict between this concept and the "in part" rationale is seen because, in a dual motivation case, the employer does have a legitimate reason for its action. Yet, an improper reason for discharge is also present. Thus, the employer's recognized right to enforce rules of its own choosing is viewed as being in practical conflict with the employees' right to be free from adverse effects brought about by their participation in protected activities. Critics of the "in part" test have asserted that rather than seeking to resolve this conflict and accommodate the legitimate competing interests, the analysis goes only half way, in that once hostility to protected rights is found, the inquiry ends and the employer's plea of legitimate justification is ignored.

In its *Wright Line* opinion, the First Circuit characterized the "in part" test as follows:

> Under this approach, a discharge was improper even if it would have occurred absent the illegal motivation, *e.g.* the employee may have committed an infraction so serious that any employee—union or non-union—would have been fired. This partial motivation test—as the Board now acknowledges—placed the "union activist in an almost impregnable position once [anti-]union animus had been established." Activists could not be discharged for conduct that would be unforgivable in the case of another employee. The result was to immunize union activists against legitimate discipline for genuine offenses and to deprive employers of the freedom to apply their own rules uniformly to all their employees.

662 F.2d at 902.

Thus, when the ALJ was evaluating the evidence in this case, the Board's earlier rule of "in part" causation was in force. Application of the "in part" causation rule, however, mandated consideration of the employer's evidence of an independent basis of discharge on the one hand, and the employee's evidence of protected activity on the other, leading to a finding of whether a legitimate reason for action was taken without the presence of any improper consideration. Thus, even though an "in part" causation test differed substantially from a

mixed motive *Wright Line* test, both tests required evaluation of conflicting evidence.

Approximately one week after the ALJ's decision was rendered, on August 27, 1980, the Board's "mixed motive" *Wright Line* rule displaced the older "in part" rule. Under *Wright Line,* it must be shown not merely that protected activity was a partial motivation for dismissal, but that such improper animus was the "but for" cause of the challenged action. Once the General Counsel had shown, however, that animus against protected activity was "a motivating factor" in the decision, the burden of persuasion shifted to the employer to show that the same decision would have been reached even in the absence of the protected action. *Wright Line,* 251 N.L.R.B. at 1089.

To complete the history of the causation/burden of proof rules in this context, this Court, in 1982, followed the First Circuit's analysis and held that the burden of proof was always on the General Counsel to show that "but for" the protected activity, an employee would not have been disciplined. *Behring International, Inc. v. NLRB,* 675 F.2d 83 (3d Cir.1982), *vacated and remanded,* —— U.S. ——, 103 S.Ct. 3104, 77 L.Ed.2d 1359 (1983). In doing so, we rejected the Board's *Wright Line* analysis. Thus, at the time that this case was argued before us, our *Behring* standard was in effect.

Since that time, however, the Supreme Court has explicitly endorsed the Board's *Wright Line* test. *NLRB v. Transportation Management Corp.,* —— U.S. ——, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). It vacated *Behring* and our cases following *Behring* and directed that we reconsider the allocation of burdens of proof in light of *Transportation Management.* It is thus clear that, to the extent Behring is inconsistent with *Wright Line, Behring* no longer has any vitality. *See Behring International, Inc. v. NLRB,* 714 F.2d 291, (3d Cir.1983) (on remand from Supreme Court).

To summarize: the ALJ, laboring under the assumption, which was correct as of that time only, that the "in part" test was the proper measure of causation in "mixed motive" cases, found that Du Pont had improperly dismissed Slaughter. When the Board's decision was announced in this case, it operated under the *Wright Line* test,[8] which specified a different test for causation, employing different elements of proof. When the case was briefed and argued before us in the spring of 1983, the *Behring* burden of proof rule was in effect in this Circuit. After argument before this Court, the Supreme Court in *Transportation Management* taught us, however, that the correct rule was not our *Behring* rule but was indeed the "mixed motive" rule of *Wright Line.*

Any factual finding coming to us from such a record must therefore be fatally tainted. The ALJ undoubtedly used the "in part" test now rejected by the Board and the Supreme Court. The Board, although giving cursory mention to *Wright Line,* accepted the ALJ's findings by incorporation without further explanation or analysis. In doing so, it necessarily infected its own

---

**8.** The Board mentioned *Wright Line* once in its decision in response to Du Pont's contention that Slaughter was dismissed due to his unauthorized posting of an NLRB notice on a company bulletin board. The Board replied:

> Respondent misconstrues the Board's reasoning, as explicated in that [*Wright Line*] decision, since it is not sufficient to show that there may exist another reason for discharge; rather, Respondent must demonstrate that the same action would have taken place even in the absence of the protected activity. Such is not the case here, however, inasmuch as Respondent stated in its opening remarks at the hearing that its intent "was not to discipline" Slaughter for posting the notice,

but just to "ask him a number of simple questions."

App. at 10. Notably absent from the Board's decision, however, is any finding that the General Counsel had made out a prima facie case that animus against protected activity was a motivating factor in the decision to dismiss. Without that finding, the burden would never have shifted to Respondent Du Pont.

Moreover, neither the Board nor the ALJ ever addressed at any time Du Pont's main contention concerning Slaughter's alleged insubordination, i.e. that he was dismissed because of his refusal to leave the work site when requested. App. at 97–98.

decision with the erroneous allocation of burdens of proof and persuasion contained in the ALJ's "finding" and opinion. The problem here is not in any way cured, therefore, even if the Board utilized the *Wright Line* analysis, since the underlying facts upon which such an analysis necessarily relied were derived from, and the product of, the now rejected "in part" causation test.

## IV.

In its unseemly haste to rush to a *Weingarten* judgment, the majority opinion attempts to avoid dealing with the misallocation of burdens of proof by clinging to the lone (an unsubstantiated) sentence in the ALJ's report—later adopted by the Board—that "Respondent's sole reason for its discharge of Slaughter was his insubordination in refusing to submit to an interview without a witness." The majority opinion relies upon this one sentence to argue that Slaughter's dismissal was not a "mixed motive" discharge, but rather was merely a "single motive" discharge, and that no dual motive analysis—be it "in part" (see *supra* p. 1067) or *Wright Line* was required. It therefore suggests that, in analyzing the evidence, it was unnecessary to invoke the *Wright Line* burdens of proof, which deal only with "mixed motive" cases, despite the fact the Du Pont introduced a substantial amount of testimony in order to demonstrate that Slaughter's dismissal was due to reasons other than his insistence on a coworker witness and despite the fact that the record on its face reveals this to be a garden variety "mixed motive" case.

The majority opinion apparently fails to perceive the circularity of this analysis. A factual finding regarding which reason, or combination of reasons, actually motivated the employee's discharge must be the *result* of a *Wright Line* analysis, not an excuse to ignore *Wright Line* in the first place. This was true of the earlier "in part" analysis as

well. If anything, the existence of this sentence in the ALJ's report actually emphasizes the need to invoke *Wright Line* rather than providing a means of escape. If one accepts the argument of the majority, then it would be a simple matter to bypass *Wright Line* altogether by using a factual finding made at the *end* of an evidentiary hearing to condone non-compliance with allocation of burdens of proof which should have been applied at the *beginning* of the fact-finding process.

Thus, if the employer raises a claim that there was an independent reason for the employee's discharge (as Du Pont has done here), then the ALJ must employ a dual motive test, as now set out in *Wright Line,* to analyze such evidence properly.[9] Du Pont has strenuously asserted from the very beginning of these proceedings that Slaughter's discharge was the result of Slaughter's insubordinate act of "refusing to leave the worksite." App. at 97–98. It is therefore necessary to invoke the *Wright Line* dual motive analysis. Of course, it may be that at the end of such analysis, the ALJ would conclude that there was in fact only one motivating factor leading to dismissal, but such a conclusion is the "cart" and not the "horse."

Here, not only did the ALJ use an incorrect causation burden of proof analysis, but the Board, by adopting the ALJ's "findings" which were made on the basis of a rejected burden of proof test, infected its own determination. Thus, even if the Board utilized a *Wright Line* analysis, by incorporating the tainted "findings" of the ALJ in that analysis, its conclusion was necessarily flawed.

Thus, I believe that we would be ill-advised is passing on a novel question of law (whether *Weingarten* applies in a non-union context) which creates a conflict between the circuits (*see supra* note 1) when it has yet to be determined at the outset whether, if the evidence in this case were correctly

---

**9.** *Cf. Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (under Title VII, employer need only articulate, without proving, an inde-pendent reason for discharge other than race in order to invoke applicable burdens of proof regarding pretext).

assessed and measured by the appropriate standard, such an issue would even arise. For instance, if because of the refusal by the ALJ to credit Slaughter's testimony, the General Counsel failed even to establish a prima facie showing, no burden under *Wright Line* would ever shift to Du Pont. At the least, therefore, we as a reviewing court are entitled to know whether the evidence in all particulars satisfied the now established burden of proof test endorsed by the Supreme Court in *Transportation Management.* We can only learn that, if the ALJ and the Board first make the essential findings by a correct burden of proof analysis, then identify that evidence which supports those findings, and finally relate and articulate those findings to the *Transportation Management* standard.

## V.

Because it is evident that the ALJ and the Board used markedly different burden of proof analyses in determining causation, and because of the character of the present record, significant doubt is raised, in my opinion, as to whether, even using the standard announced in *Transportation Management,* this record could ever support a *Weingarten* order. Thus, I cannot conceive of an analysis under which the Board's present order may be enforced. Rather than deny enforcement, however, particularly in light of the history of changing burden of proof standards as described in text *supra,* I believe it to be far sounder from a jurisprudential standpoint to remand to the Board for findings based on a uniform test of causation. As we stated in *In re Bildisco,* 682 F.2d 72 (3d Cir.1982), *affd.,* — U.S. —, 104 S.Ct. 1188, 79 L.Ed.2d 482:[10]

Where the state of the law is not settled, and the court of first instance has not set forth a reasoned elaboration for its decision, as here, an appellate court cannot determine what motivated the trial court's decision. It cannot ￵properly

determine whether there was a specific act or omission constituting legal error. Even though an appellate court can affirm on the basis of reasons different from those set forth in the trial court, a reviewing court cannot properly perform its function until the parties are given the opportunity to prepare a record and the trial court the opportunity to apply in the first instance newly formulated precepts to the facts adduced.

## VI.

I would therefore grant Du Pont's petition for review to the extent that I would remand this case to the Board for proceedings consistent with my foregoing opinion. In so doing, I would deny enforcement of the Board's order for the reasons which I have stated.

---

**10.** In *Bildisco,* this Court also had for the first time announced a standard to be applied in the rejection of executory collective bargaining agreements. Because that standard had not

been available or known to the bankruptcy court or the district court, we also remanded for consideration by the courts below "in light of the precepts we announce today."